Steven G. Sklaver (237612)
ssklaver@susmangodfrey.com
Michael Gervais (330731)
mgervais@susmangodfrey.com
Glenn Bridgman (298134)
gbridgman@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Telephone:  (310) 789-3100
Facsimile: (310) 789-3150

Seth Ard (*pro hac vice forthcoming*)
sard@susmangodfrey.com
Ryan Kirkpatrick (243824)
rkirkpatrick@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| BOAGF Holdco LP, on behalf of itself and all others similarly situated, | CASE NO. |
| Plaintiff, | **CLASS ACTION** |
| vs. | |
| TRANSAMERICA LIFE INSURANCE COMPANY, | **COMPLAINT FOR BREACH OF CONTRACT** |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff, by and through the undersigned attorneys, brings this action on behalf of itself and all others similarly situated against Defendant Transamerica Life Insurance Company ("Transamerica").

## NATURE OF THE ACTION

1.    This is a class action brought on behalf of Plaintiff and similarly situated owners of Transamerica universal life insurance policies. Plaintiff seeks to represent a class of Transamerica policyholders who have been subjected to an unlawful and excessive monthly deduction rate ("MDR") increase.

2.    The policies at issue in this case are flexible premium universal life policies issued, insured, or assumed by Transamerica that were subjected to an increase in MDR rates announced in 2021 (collectively, the "Policies").

3.    The principal benefit of universal life policies generally, and the Policies specifically, is that, unlike other kinds of whole life insurance that require fixed monthly premium payments, the premium payments required for universal life policies are flexible and need only be sufficient to cover the MDR charges and certain other specified expenses. The MDR charge is typically the highest charge that a policyholder pays.

4.    Any premiums paid in excess of MDR charges and expense components are applied to the policy's "accumulation account," sometimes known as "policy account" or "cash value."  These excess premiums earn interest, often called the credited rate.

5.    The Transamerica policies explain how the MDR charge is calculated using "Monthly Deduction Rates" (these rates are often referred to as "COI rates"). Because the MDR charges are the main driver of how much money needs to be paid into these policies, the policy term explaining how and when the Monthly Deduction Rate can be adjusted is one of the most important terms of the contract. Here, the Policies include the following term for adjusting Monthly Deduction Rates:

Any change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

6.     The Policies also include a term prohibiting recoupment of past losses. This term states that Transamerica "do[es] not distribute past surplus or recover past losses by changing the monthly deduction rates."

7.     In late 2021, after Plaintiff's policy had been in force for more than 20 years, Transamerica announced a large Monthly Deduction Rate increase set to take effect in 2022. Plaintiff was notified that its Monthly Deduction Rate was set to increase by 61%. Transamerica stated that this Monthly Deduction Rate increase was "in addition to the customary increases that are associated with age" and attributed them to Transamerica's "current expectations about our future costs for providing this coverage." Transamerica provided no further explanation for the increase, which resulted in Plaintiff experiencing a massive increase in premiums required to maintain the policy in force.

8.     As a direct result of Transamerica's actions, Class Members are faced with the imminent harm of either paying the exorbitant and unjustified new charges, or losing the benefits for which they have dutifully paid premiums for many years.

9.     The Policies were issued a long time ago, many over 20 years ago. As a consequence, a significant portion of the policyholders are now elderly; many of them are 75 years old or older. The MDR increase violates the Policies in numerous respects.

10.     *First*, the main driver of Monthly Deduction Rates are the insurer's mortality expectations. To justify such a massive rate hike, Transamerica must claim that it has experienced a recent, massive deterioration in its mortality expectations. But both industry experience and Transamerica's own statements belie any such

claim: mortality experience has materially improved industry-wide since the Policies were issued, and Transamerica itself has acknowledged in recent years that its mortality expectations have continued to *improve*. There is no ground for the massive MDR hikes imposed by Transamerica given the mortality improvements.

11.    It is now well-documented that nationwide mortality expectations have *improved* significantly over the past several decades. The Society of Actuaries ("SOA") and the American Academy of Actuaries (the "Academy") periodically publish mortality tables from information collected from America's largest insurers. Those tables show that mortality expectations have improved at a rate of roughly 1 percent per year over the past three decades.

12.    ***Second***, no "future cost factors," including those delineated in the Policies – expenses, interest, persistency, or taxes – have changed materially for the worse, or to any extent that could justify such a massive MDR hike, especially in light of the improved mortality expectations. Transamerica has not had any increased costs due to expenses, interest, persistency, taxes, or any other future cost factor that could lead to this massive increase – nor has it identified any in its statements to policyholders or elsewhere. The SOA periodically publish studies of industry expenses for administrating policies. Those studies show slow rates of expense increases for this minor element of the MDR that would be immaterial to the MDR for a 75-year-old. Similarly, the SOA periodically publish studies of persistency which show immaterial changes in policy holder behavior over the last decade, while corporation tax rates have if any been reduced. For example, the Tax Cuts and Jobs Act of 2017 reduced the headline corporation tax rate from 35% to 21% starting January1, 2018.

13.    ***Third***, Transamerica's massive MDR increase on the Policies recoups past losses, in breach of the contractual terms stating that any change in the Monthly Deduction Rates will not recover "past losses" and "will be prospective," subject to Transamerica's expectations as to "future cost factors." Insurance is intended to

4

cover policyholders for unforeseen future events, with the insurance company taking the risk of the unknown (whereas events in the past are known). These terms are meant to prevent the insurer from engaging in a bait-and-switch tactic, where it projects future premiums in the future using an original scale of Monthly Deduction Rates, collects premiums, and then, with customers locked in, turns around many years later and reveals more expensive Monthly Deduction Rates due to alleged changes in expectations that happened long ago. Transamerica's mortality expectations have continued to improve, and any mismatch between its pricing assumptions and its current assumptions would have been known and recognized by Transamerica many years ago. As a result, to the extent the MDR increase offsets alleged losses, those losses were recognized many years ago, and the MDR increase was designed to and did recoup past losses in violation of the Policies.

14.     The MDR increase and Transamerica's actions preceding it therefore breached the Transamerica policies by (a) not determining Monthly Deduction Rates based on its expectations as to future cost factors as required by the Policies, and (b) imposing a massive increase in Monthly Deduction Rates to recoup past losses at the expense of the Policyholders.

## **THE PARTIES**

15.     Plaintiff BOAGF Holdco LP, is a Delaware limited partnership, whose 99% partner is BlackOak Alpha Growth Fund in Cayman. Plaintiff is the owner of a TransUltra 115 universal life insurance policy (Policy No. 00060019286), issued by Transamerica Occidental in California on or about December 11, 1997, with a face amount of $1,200,000.

16.     Defendant Transamerica is a corporation organized under Iowa law, with its principal place of business located at 6400 C Street SW, Cedar Rapids, Iowa, 52499. Transamerica is a citizen of Iowa.

17.     Transamerica Occidental, which issued Plaintiff's policy, was a corporation organized under California law, with its Home Office and principal place of business at 1150 S. Olive Street, Los Angeles, California, 90015.

18.     On or about October 1, 2008, Transamerica Occidental was merged into Transamerica, making Transamerica its successor-in-interest. Transamerica Occidental and Transamerica are collectively referred to as "Transamerica."

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the parties to this action. The Plaintiff is a resident of Delaware. Transamerica transacts business in California, issued this policy in California to a California owner and insured, by a former Transamerica company based in Los Angeles, California, and many Class Members are California residents.

20.     Jurisdiction over Transamerica is also proper because it has registered with the California Secretary of State, purposely availed itself of the privilege of conducting business in California, and because it currently maintains systematic and continuous business contacts with this State. Transamerica regularly transacts business in California and, on information and belief, hundreds of the putative Class Members are California residents.

21.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the Complaint alleges claims on behalf of a national class of policyholders who are minimally diverse from Transamerica, as there are individuals who are members of the putative class that are citizens of a state other than Iowa, and because the aggregate of these claims exceed $5,000,000.

22.     Venue is proper in this District under 28 U.S.C. § 1391 because Transamerica maintains substantial operations in this District; many Class Members either reside or did business with Transamerica in this District; Transamerica engaged in business in this District; Plaintiff's policy was issued by a Transamerica company based in this District; Plaintiff's policy was issued to the policyowner in

Torrance, California, which is in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District, and because Transamerica entered into transactions and received substantial profits from policyholders who reside in this District.

## FACTUAL BACKGROUND

### A.    The Transamerica Policies at Issue

23.    The Policies are flexible premium universal life policies issued by Transamerica (including its predecessors) in the late 1990s and early 2000s. The class on whose behalf this action is being brought consists of all owners of universal life insurance policies, insured or assumed by Transamerica that have been, or will be, subjected to the Monthly Deduction Rate increase that Transamerica began announcing in 2021.  On information and belief, this 2021 COI increase does not include any of the Policies whose claims about Monthly Deduction Rate increases imposed by Transamerica in 2017 and 2018 were resolved by the settlement in *Thompson et al. v. Transamerica Life Insurance Co.*, Case No. 2:18-cv-05422 (C.D. Cal.),[1] nor does it include any of the Policies whose claims about Monthly Deduction Rate increases imposed by Transamerica in 2015 and 2016 were resolved by the settlement in *Feller et al. v. Transamerica Life Insurance Co.*, Case No. 2:16-cv-01378 (C.D. Cal.).[2]

24.    Traditionally, life insurance companies sold two types of policies: term and whole life insurance. Term life insurance is for a term of years, normally building up no cash value and expiring without value. Whole life insurance provides coverage

---

[1]  The Settlement Class involved the following types of life insurance policies subjected to MDR increases imposed in 2017 and 2018: TransSurvivor 115 97/98/99 and TransUltra 115 98/99.

[2] The Settlement Class involved the following types of life insurance policies issued between 1983 and 2008 subjected to MDR increases imposed in 2015 and 2016: Assured Life, Assured Life T7, Preferred Policyowners Life, Transcender, TransLife, TransMax, TransMax Survivor 90, TransMax Survivor 91, TransSurvivor Life 92, TransSurvivor Life 95, TransSurvivor Life 96, TransUltra 91, TransUltra 93, TransUltra 95, TransUltra 96, TransUltra EX, TransUltra XL, TransUltra SP, TSSL, TSSL 2000, TSSL EX, TSSL XL.

for life and provides an increasing cash value that is available when needed. The premiums remain level throughout the life of the policy.

25.    Universal life insurance provides more flexibility than whole or term life insurance. There are no fixed or minimum premium payments required by the policies. The principal benefit of universal life policies is that they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for universal life policies need only be sufficient to cover the MDR charges and certain other specified expenses. The MDR charge is typically the highest expense that a policyholder pays.

26.    Universal life policies are designed to be permanent policies, which are held until the death of the insured. As Transamerica explains on its website, "[U]niversal life insurance is a type of permanent life insurance that provides coverage for life, as long as premiums are paid."

27.    Under the provisions of the Policies, an "accumulation account" is established for each policy, into which the policyholder's premium payments are deposited. Transamerica's Policies use the term "Monthly Deductions" to refer to the MDR charge. At the end of each policy month, Transamerica withdraws a Monthly Deduction (*i.e.*, MDR charge) from the Policy's accumulation account.

28.    Any premiums paid in excess of MDR charges and expense components earn interest in the accumulation account at the declared interest rate not less than the guaranteed minimum interest rate specified in the policy. Plaintiff's policy, for example, provides for a guaranteed interest at the rate of 4%. Other policies contain similar interest rate guarantees.

29.    The structure of universal life policies is beneficial because it allows policyholders to minimize their capital investment and generate greater rates of return through other investments. Depending on the interest rate environment and the

credited rate, other policyholders may choose to heavily fund their policies and use the interest to pay MDR charges and grow the accumulation value.

30.    The size of the MDR charge is highly significant to Plaintiff and all universal life Policyholders for at least two important reasons. First, it informs the minimum amount of money they must pay to keep a policy in force. Second, high Monthly Deduction Rates can quickly diminish a policy's accumulation value (*i.e.*, the savings component) and reduce the amount of money on which the policyholder can earn interest. Even small changes in the MDR can produce a dramatic increase in the dollar amount of the MDR charged by Transamerica, particularly for elderly insureds. The higher the MDR, the greater the premiums required to maintain a positive balance in the accumulation account. Absent a secondary guarantee, if a policy accumulation account value diminishes such that MDR charges can no longer be deducted, and the appropriate time expires after Transamerica provides an accurate and adequate grace notice, then a policy may lapse unless additional premiums are paid in.

31.    Plaintiff's policy includes the following "Monthly Deduction" rate term:

> Any change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

32.    Plaintiff's Policy also contains an additional non-recoupment term limiting Transamerica's ability to increase the MDR: "We do not distribute past surplus or recover past losses by changing the monthly deduction rates."

33.    Notably, this limits Transamerica's ability to change the Monthly Deduction Rates only where expected "future cost factors" associated with the cohort of in-force Policies are less favorable than Transamerica previously assumed for

those same cost factors. Transamerica is not permitted, for example, to increase Monthly Deduction Rates because the interest rate spreads are lower than previously assumed.

34.    The Policies are all issued on standardized form policies, and insureds are not permitted to negotiate different terms. They are all contracts of adhesion.

**B.    Transamerica's Announcement of Unlawful MDR Hike**

35.    Beginning in late 2021, Transamerica suddenly announced the unilateral MDR rate increase on the Policies.

36.    Transamerica began to notify Policyholders of the MDR rate increase through a uniform form letter. In the letter, Transamerica purported to explain "What's Changing and Why." Transamerica claimed that it was increasing Monthly Deduction Rates "based on our current expectations about our future costs for providing this coverage" and that the increases are "in addition to the customary increases that are associated with age."

37.    Transamerica thus acknowledged in part the limited grounds upon which the Policies permit an increase in the MDR and represented the increase was driven by those limited grounds. Transamerica did not give any other explanation for the increase in the MDR in the notice letter.

38.    Transamerica began imposing the MDR increase on the Policies, resulting in a massive increase in the premiums necessary to maintain coverage.

39.    Pursuant to the MDR increase, Transamerica has increased the amount taken from Plaintiff's and Class Members' accumulation accounts upon their respective Policy's anniversary dates. For example, beginning February 28, 2022, Plaintiff's policy experienced an approximately 61% increase in its MDR. Plaintiff and Class Members are now required to pay much higher Monthly Deduction Rates to maintain the same level of coverage under their respective Policies.

## C.   **Transamerica's Unlawful MDR Hike**

40.   The Polices do not authorize Transamerica to set or increase Monthly Deduction Rates in whatever amount or by whatever method it determines.

41.   Rather, the Policy states that "any change" in the MDR "will be prospective and will be subject to our expectations as to future cost factors." By limiting MDR changes to being based only on expectations "as to future cost factors," the Policy forbids MDR increases that are based on a carrier's desire to increase profits or to recoup past losses. Further confirming this, the Policy explicitly states that Transamerica will not increase the MDR to "recover past losses."

42.   Transamerica does not claim that the Monthly Deduction Rate increase is based on anything but "future cost factors," telling policyholders only that it is increasing the MDR based on "our current expectations about our future costs for providing this coverage." But no change to any of the enumerated "future cost factors" independently, nor when considering all of the enumerated factors together, could warrant the massive MDR increase. Not only did Transamerica ignore positive changes in enumerated factors – such as recent corporate tax reform that benefited Transamerica – but recent changes in mortality, expenses, interest, persistency, and taxes and other cost factors could not possibly warrant an increase, much less one of this massive size.

### a.   **Transamerica's Expectations of Future Mortality Experience Have Improved**

43.   Transamerica's expectations as to "mortality" could not have changed materially for the worse in recent years to warrant an increase in Monthly Deduction Rates, much less a massive one. To the contrary, mortality expectations have improved since Transamerica issued the Policies.

44.   Insurers like Transamerica systematically quantify their mortality expectations on an annual or biennial basis. They perform experience studies which examine their historical mortality experience and, from that mortality experience,

develop predictions of mortality they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status and duration since underwriting. Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect the carrier's expectations of future mortality.

45.    Beginning at least as early as 1941, the National Association of Insurance Commissioners ("NAIC") has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. The SOA has established a committee to develop an update of the CSO tables, which are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. A report on the updated CSO tables by the SOA was published in October 2015 and showed significant reductions in insurance company reserves due to recent mortality improvements. In October 2022 the SOA published a report on older age mortality aimed for ages 70 upward. The report was part of the SOA process that helps determine whether refinements are needed in the 2015 Valuation Basic Tables. The SOA used the most recent experience data available to it. The report did not find any need to make changes to VBT 2015.

46.    The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at the request of the NAIC, SOA and the American Academy of Actuaries ("Academy") produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table

and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

47.   The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables are showing a substantial improvement in mortality in a 20-year time period. These mortality improvements represent a substantial benefit that Transamerica should have passed on to policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

48.   The SOA established a committee to develop an update of the CSO tables. A report on the updated CSO tables by the SOA was published in October 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

49.   The 2001 CSO Mortality Table was generated from the 1990-1995 Basic Mortality Tables published by the SOA. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares them to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975-1980 Basic Select and Ultimate Mortality Table
- 1985-1990 Basic Select and Ultimate Mortality Tables

- 1990-1995 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

50.     The 1990-1995 Basic Table reflected the death rates observed by twenty-one large life insurance companies with policy anniversaries between 1990 and 1995. The 2001, 2008, and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently. The report accompanying the 2015 Valuation Basic Table states: "The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee ("ILEC") have shown significant mortality improvement in the mortality experiences experienced by the industry from that underlying the 2001 CSO table development." Other surveys have also noted mortality improvements. In May 2013, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rate and mortality improvements at older ages, which showed material rates of mortality improvements. The report was based on a survey of insurance companies. In March 2014, the actuarial firm Milliman published a report sponsored by the SOA called "Select Period Mortality" showing select rates of mortality that are strongly improved over 2001 VBT. Their report was based on a survey of insurance companies.

51.     This trend of improving mortality expectations has continued to the present day in the industry. In 2017, the SOA published a study with recommendations for mortality improvement assumptions for insurance reserving for AG-38 (Actuarial Guideline No. 38), which covers reserving for certain universal life insurance policies. The SOA updates this study annually and these studies show

improving mortality across the board for the last five years, with no negative figures in any published table from 2013 and 2017. And in 2019, the SOA issued a report finding that in 2018, the United States age-adjusted mortality rate realized its largest decrease since 2009, and the 2018 mortality rate is now the lowest mortality rate in U.S. history. These mortality improvements represent a substantial benefit that Transamerica should have passed on to policyholders in the form of cheaper Monthly Deduction Rates, but never did.

52.     Industry insiders also report continuing and consistent mortality improvements. For example, statistics published by The Human Mortality Database (HMD, organized by the Department of Demography of the University of California, Berkeley), show increases in life expectancy and lowering of mortality rates between 2010 and 2015 for older-aged individuals in the United States. And a SOA report on historical population mortality rates shows continuing mortality improvements every five years between 2000 and 2014.

### b.     Other Factors Do Not Warrant an Increase

53.     Transamerica also implicitly suggests that the increase is based on changes in the other factors – its expectations as to future expenses, interest, persistency, and taxes – but it has not explained how. The massive increase could not be based on changes to any of these factors, especially in light of improving mortality expectations, which outweigh any of these and any other cost factors.

54.     *First*, Transamerica's expectations as to future "expenses" could not have changed materially for the worse in recent years to warrant an MDR increase, much less a massive one. Such expenses have at most only a minor impact on the expected future profitability of the Policies. Transamerica is incurring no further sales or acquisition costs (such as agent commissions) in connection with the Policies. The administrative expenses associated with the Policies are stable and predictable. The large majority of expenses incurred by an insurance company for universal life insurance policies occur at the time of sale the policy, with the

commitment to pay original commissions to sales teams. Transamerica cannot base its change on events that happened in the past (*i.e.*, the sale of the policy) without violating the contract's bar on recouping prior losses. Additionally, the allocated expense of maintaining insurance contracts is nominal and does not materially change from year to year, let alone in a way that could justify such a massive increase in MDR. Moreover, the Policies already charge a separate "monthly expense charge" and "administrative fees" designed to cover certain expenses. Periodically the SOA publish Generally Recognized Expense Table (GRET). In August 2022 the SOA published its recommendations for 2023. As can be seen from the tables below, most of the expenses for a life insurance policy are "Acquisition" costs – *i.e.*, broker fees, that are already incurred and prohibited from being recouped by the policy language. The maintenance costs are a tiny fraction of the MDR. For example, the direct marketing distribution channel annual maintenance cost of $59pa was only $13pa more expensive than the equivalent figure ($46 pa) in 1998 and does not justify increasing the Plaintiff's MDR charges by tens of thousands of dollars.

**TABLE 1**
PROPOSED 2023 GRET FACTORS, BASED ON AVERAGE OF 2019/2020 DATA

| DESCRIPTION | Acquisition per Policy | Acquisition per Unit | Acquisition per Premium | Maintenance per Policy | Companies Included | Average Premium Per Policy Issued During Year | Average Face Amt (000) Per Policy Issued During Year |
|---|---|---|---|---|---|---|---|
| Independent | $180 | $1.00 | 45% | $54 | 141 | 3,073 | 204 |
| Career | 203 | 1.10 | 51% | 61 | 84 | 2,296 | 197 |
| Direct Marketing | 197 | 1.10 | 49% | 59 | 21 | 899 | 57 |
| Niche Marketing | 147 | 0.80 | 37% | 44 | 30 | 507 | 14 |
| Other* | 153 | 0.90 | 39% | 46 | 106 | 853 | 72 |
| * Includes companies that did not respond to this or prior year surveys | | | | | 382 | | |

| Expense Type | Expense Factor | GRET Year | Branch Office | Direct Marketing | Home Service | Career General Agency | Brokerage | PPGA | Multiline | Other Types |
|---|---|---|---|---|---|---|---|---|---|---|
| Maintenance | Per Policy | 1998 | $33 | $46 | $27 | NA | NA | NA | NA | $37 |
| | | 2001 | $35 | $43 | $30 | NA | NA | NA | NA | $39 |
| | | 2003 | $33 | $40 | $31 | NA | NA | NA | NA | $43 |
| | | 2006 | $38 | $56 | $36 | NA | NA | NA | NA | $39 |
| | | 2007 | $31 | $65 | $32 | NA | NA | NA | NA | $40 |
| | | 2008 | $27 | $56 | $37 | $54 | $42 | $40 | $56 | $36 |
| | | 2009 | $30 | $55 | $33 | $53 | $49 | $50 | $56 | $36 |
| | | 2010 | $30 | $50 | $35 | $55 | $49 | $45 | $61 | $37 |

Source: SOA GRET tables.

55.    In addition, in January 2018, Transamerica announced that it entered an agreement with Tata Consultancy Services ("TCS"). According to the press release issued by Transamerica, "TCS will administer Transamerica's life insurance [business] . . . and take on administration of over 10 million policies." The TCS agreement is expected to result in annual administrative expense savings to Transamerica of approximately $70 million initially, growing to annual savings of $100 million over time. If anything, Transamerica's projected future expenses associated with the Policies is more, not less favorable, than in the past.

56.    ***Second***, Transamerica's expectations as to "interest" could not have changed materially for the worse in recent years to warrant an increase in MDR rates, much less a massive one. Interest affects an insurance company's ability to generate income from investments on earnings from its portfolio of insurance policies. Different insurers earn, and expect to earn, different returns on their investment portfolios.

57.    The massive MDR rate increase cannot be explained or justified by the "interest" factor enumerated in the Policies, nor can it be justified by any purported deviation between projected and actual funding levels. Even if Transamerica's current expectation is that the company will experience spread compression or even negative interest spreads with respect to the Policies, that would not and could not justify a Monthly Deduction Rate increase of 61% and above. Monthly Deduction Rates may only be changed to account for changes in *future* cost factors, not to compensate the company for any interest-related losses in the past. Further, the policies have a *separate* "guaranteed interest rate," which is adjustable to account for any changes in the interest rate environment, and a MDR increase cannot be done to circumvent the guaranteed minimum.

58.    Transamerica is earning a positive interest income on the policies and, as such, its guaranteed interest obligation cannot properly be viewed as a "cost." Rather, to the extent future expected interest spreads may be lower than projected

when the Policies were priced and issued, at most Transamerica is earning lower interest profits.

59.   ***Third***, Transamerica's expectations as to future "persistency" could not have changed for the worse in recent years to warrant an increase in MDR rates, much less a massive one. Plaintiff's policy issued in 1997, and on information and belief, the Policies of all of the Class Members have been in force for more than 6 years. A 2012 SOA industry study – reporting on a survey of the industry – indicates that between 2001 and 2009, the industry lapse rates for universal life policies that have been in force more than 6 years are stable, varying less than approximately 2 percentage points over that span, and that the lapse rates become more stable the longer the policy has been in force. This indicates that any volatility that Transamerica may have seen in these policies would have occurred in the early years, not now. In September 2018 the SOA published an experience study for premium persistency and surrender/lapse experience for flexible premium life insurance updating the figures for lapse rates. The updated figures in this report show minimal change in lapse rates from the 2012 study. And to the extent Transamerica priced the policies using unreasonable lapse-supported assumptions, it may not now pass the projected late duration losses on to persisting policyowners by increasing the MDR rate.

60.   Moreover, the only "cost" associated with persistency is incurred when Policies are surrendered, requiring Transamerica to pay terminating Policyholders the cash surrender value of the surrendered Policy. Where persistency is higher than Transamerica assumed at pricing, thereby resulting in fewer surrenders, the costs attributable to cash surrender payments are lower, not higher, than projected when the Policies were priced. Accordingly, to the extent Transamerica expected future persistency to be higher than it assumed when the Polices were designed and issued, that "cost factor" would suggest a lower MDR, and certainly would not support or justify a MDR increase.

61.  ***Fourth***, Transamerica's expectations as to future "taxes" could not have changed materially for the worse in recent years to warrant an increase in MDR, much less a massive one. To the contrary, Transamerica's expectations as to future taxes are now materially better, in light of the Tax Reform Act of 2017, which should have resulted in lower Monthly Deduction Rates, not an increase in rates. Aegon N.V., a Netherlands corporation, acquired Transamerica in 1999. According to Aegon N.V.'s reported financial results in the fourth quarter of 2017, its shareholders' equity "increased by EUR 1.0 billion . . . resulting from US tax reform, due to a reduction in net deferred tax liabilities, of which EUR 554 million was recognized in the profit and loss account." Rather than increased expenses, Transamerica will realize lower projected federal taxes as a result of reduced rates and other benefits to insurance companies. Transamerica's MDR increase makes no mention of the more favorable corporate tax rate, which if anything should have lowered Monthly Deduction Rates, not raised them.

62.  The future cost factors enumerated in the Policies or otherwise, separately or in combination, do not explain the recent MDR increases. Nor is there any other cost factor, beyond those enumerated in the Policies, that can plausibly explain or justify a MDR increase of this size. In short, any future underperformance of the Policies is attributable to Transamerica's own conduct, rather than any change in underlying experience relating to the cost factors that would permit an increase under the Policies.

### c.  The MDR Rate Hike Recoups Past Losses

63.  The Policies explicitly prevent Transamerica from making any change in Monthly Deduction Rates to recoup past losses. The Policies forbid MDR increases to make up for past losses, or from implementing an MDR increase that would result in the carrier making more profit on the policies than it previously expected using its prior expectations. One purpose of this provision is to prevent the insurer from engaging in a bait-and-switch tactic, where it projects cheaper Monthly

Deduction Rates in the future, collects premiums, and then turns around years later and reveals more expensive Monthly Deduction Rates due to changes in expectations that happened long ago or were present at the time of the sale.

64.     Because non-guaranteed elements such as the MDR are required to reflect expectations of *future* experience, Transamerica is precluded from re-determining those elements to recoup past losses, including past losses attributable to the Policies.  Transamerica increased MDR rates on other universal life policies in 2015 and again in 2017, and in doing so, it reset the baseline for any MDR increase analysis going forward for the policies at issue in this case. Transamerica cannot possibly have had a deterioration in mortality expectations or other expectations since 2017 that could justify such a massive increase in Monthly Deduction Rates. Similarly, in connection with Transamerica's prior MDR increases, Transamerica claimed they were justified because of worsened mortality expectations for older age mortality that Transamerica adopted in 2014 and reflected those losses on its financial books in 2014.  But Transamerica cannot use changed mortality from 2014 to justify an MDR increase in 2022 – that is illegally recouping past losses. And it is implausible that Transamerica had a deterioration in mortality expectations since 2014 that could justify such a massive increase in MDR.

65.     On information and belief, the Policies were designed to allow Transamerica to realize high mortality profits in the early years, immediately after the policies were priced and issued. But as the policies progressed to the later durations, Transamerica faced constrained future profits and looming future losses resulting from its policy design choices. When the date arrived to confront its pricing decisions, Transamerica reacted by saddling policyholders with the massive MDR increases at issue in this litigation to recoup past losses. The MDR hike was imposed to mitigate or avoid those losses, making the Policies more profitable in future years than the profit levels with original pricing assumptions using Transamerica's own mortality assumptions.

66.     The massive MDR hike can only be explained as an attempt to recoup past losses. Insurance company actuaries are required to closely monitor and report on trends affecting non-guaranteed elements of its insurance policies. Material deviations between current and future expected profitability do not occur overnight; they are gradual trends for which actuaries can and do make incremental adjustments.

67.     Transamerica's MDR increase recoups past losses in breach of the terms of the Policies and is an increase in rates for reasons that are not based on its expectations as to future cost factors.

### d.     The MDR Hike Harms Policyholders

68.     Transamerica knows, and fully expects, that many Class Members surrender or lapse their Policies following the MDR increase. To the extent that policyholders surrender or lapse their Policies following the MDR increase, Transamerica will wipe the unprofitable policies from its books.

69.     Transamerica has actively sought to encourage and provoke Plaintiff and Class Members to terminate their Policies or reduce the face amount of coverage enough to allow Transamerica to collect the increased monthly deduction charges. In its form letter announcing the MDR increase, Transamerica suggested that policyholders "may choose to surrender your policy for the cash value … You can take this in cash or you may be able to exchange it for another life insurance policy that accumulates cash value." Transamerica also suggested an alternative "Reduced Face Amount Option," which would drastically reduce the insurance coverage while still allowing Transamerica to pocket the increased Monthly Deductions as long as the Policy remained in force.

70.     The Class Members hit by Transamerica's MDR increase include elderly Policyholders who have dutifully paid premiums for decades with the expectation that the Policies would provide protection for their families. For many Class Members, they will lose the cash value of the policy if they cannot pay the increased costs to maintain the policy. Due to age-related underwriting

considerations, alternative life insurance protection for these elderly policyholders is now either unavailable or prohibitively expensive. These policyholders, who are effectively uninsurable due to their age, face the prospect of: (1) surrendering their policies and losing their death benefits at an age when purchasing other life insurance coverage is practically impossible; (2) permitting Transamerica to deplete their policy values through its MDR increase until there is nothing left and the policy "shock lapses"; (3) paying vastly increased premiums with no assurance the cost of insurance will not continue to increase; or (4) accepting cuts in death benefits.

71.     As a result of Transamerica's actions, many Class Members are faced with the decision of either paying the exorbitant and unjustified MDR increase, or forever forgoing the life insurance benefits for which they have dutifully paid premiums for years.

## CLASS ACTION ALLEGATIONS

72.     This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The class – referred to as the "MDR Increase Class" – consists of:

> All owners of universal life insurance policies issued, insured or assumed by Transamerica Life Insurance Company, or its predecessors or successors, subjected to the monthly deduction rate increases first announced in or after 2021.

73.     The Class consists of hundreds of Transamerica policyholders and is thus so numerous that joinder of all members is impracticable. The identities and addresses of the members of the Class can be readily ascertained from business records maintained by Transamerica.

74.     The claims asserted by Plaintiff are typical of the claims of the Class Members.

75.     Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiff will fairly and adequately protect the

interests of the Class and has no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Class.

76.    The self-interest of Plaintiff is co-extensive with and not antagonistic to those of absent Class members. Plaintiff will undertake to represent and protect the interests of absent Class members.

77.    Plaintiff has engaged the services of counsel who are experienced in complex class litigation and life insurance matters, including MDR increase matters, who will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiff and the putative Class members.

78.    Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action. The names and addresses of all class members are in Transamerica's business records, and class members are readily and objectively identifiable.

79.    This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

        a.    the construction and interpretation of the form insurance policies at issue in this litigation;

        b.    whether Transamerica's actions to increase the monthly deductions on certain universal life policies violated the terms of those form policies;

        c.    whether Plaintiff and class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology of calculating those damages.

80.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.    because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

b.    when defendant's liability has been adjudicated, claims of all class members can be determined by the Court;

c.    this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

d.    without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

e.    this action does not present any undue difficulties that would impede its management by the Court as a class action.

## **FIRST CLAIM FOR RELIEF**

### **Breach of Contract**

### **(on behalf of Plaintiff and the MDR Increase Class)**

81.    Plaintiff reallege and incorporate all allegations of this complaint as if fully set forth herein.

82.    The Policies are binding and enforceable contracts.

83.    At all relevant times, Plaintiff and other class members have paid premiums to Transamerica and have otherwise performed all their obligations under the Policies.

84.    The MDR increase and conduct by Transamerica that preceded it have materially breached the polices in several respects, including but not limited to:

a.  not determining Monthly Deduction Rates based on the factors enumerated in the contract that Transamerica claimed the increase was based on; and

b.  imposing a massive increase in Monthly Deduction Rates to recoup past losses;

85.  Plaintiffs have performed all obligations under the policies, except to the extent their obligations have been excused by Transamerica's conduct as set forth herein.

86.  As a direct and proximate cause of Transamerica's material breaches of the policies, Plaintiff and class members have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the MDR Increase Class, pray for judgment as follows:

1.  Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.  Awarding Plaintiff and the damages class compensatory damages, restitution, disgorgement, reinstatement of lapsed and/or surrendered policies, and any other relief permitted by law or equity;

3.  Awarding Plaintiff and the damages class pre-judgment and post-judgment interest as well as attorneys' fees and costs, and all other relief set forth above;

4.  Awarding Plaintiff and the classes such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the class hereby demand a trial by jury as to all issues so triable.

DATED:  October 27, 2022

Respectfully submitted,

By: */s/ Steven G. Sklaver*

Steven G. Sklaver (237612)
Michael Gervais (330731
Glenn Bridgman (298134)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Telephone:  (310) 789-3100
Facsimile: (310) 789-3150
ssklaver@susmangodfrey.com
mgervais@susmangodfrey.com
gbridgman@susmangodfrey.com

Seth Ard (*pro hac vice forthcoming*)
Ryan Kirkpatrick (243824)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com